# COURT OF APPEALS OF VIRGINIA

---

**Record No. 0280-24-2**

---

EMANUAL WAYNE MONTAY WHITE, S/K/A
EMANUEL WAYNE MONTAY WHITE
v.
COMMONWEALTH OF VIRGINIA

---

Present: Judges Beales, Chaney and Bernhard
Argued at Richmond, Virginia

Opinion Issued July 14, 2026[*]

---

**FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY**
William E. Glover, Judge

Brett P. Blobaum, Senior Appellate Attorney (Virginia Indigent Defense Commission, on briefs), for appellant.

Kelly L. Sturman, Assistant Attorney General (Jason S. Miyares,[1] Attorney General; Rebecca Johnson Hickey, Assistant Attorney General, on brief), for appellee.

---

**MEMORANDUM OPINION BY**
**JUDGE VERNIDA R. CHANEY**

Emanuel Wayne White appeals his convictions for felony assault and battery of a law enforcement officer and two counts of obstruction of justice. He challenges the sufficiency of the evidence, arguing that the trial court erred in denying his motion to strike all charges. White also appeals his sentence, contending that the five-year post-incarceration condition of good behavior exceeds the statutory maximum authorized by Code § 19.2-303, and is, therefore, void ab initio. For the reasons that follow, this Court affirms the convictions. However, because the sentencing order imposes a fixed post-incarceration condition that exceeds the statutory ceiling

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

on post-release supervisory authority under Code § 19.2-303, we vacate the sentence and remand for resentencing within the statutory limits.

BACKGROUND[2]

On March 10, 2023, Deputy Cabrera approached White in a Wawa store parking lot while investigating a domestic violence incident.[3]  A woman reported to police dispatch that White had physically assaulted her following a verbal altercation and that she was "calling from inside of her car," while White remained outside her vehicle.  R. 137, 151.

Before arriving at the Wawa, Deputy Cabrera learned that there were outstanding warrants for White's arrest "from multiple agencies with some underlying charges including assault on law enforcement."  R. 137.  Upon arriving, Cabrera approached White with a K-9 and drew his firearm.  R. 144, 152.  Cabrera informed White that he was under arrest and ordered him to the ground.  White repeatedly refused to comply and stated, "Fuck you.  I'm not going to comply."  R. 144, 164.

White then took a "fighting stance," which Cabrera described as "an aggressive stance where one foot is back," similar to a mixed martial arts or boxing posture with "hands up in [his] face."  R. 145.  White also extended his middle fingers.  R. 145.  Although White made "no verbal threat" at that point, Cabrera testified that he understood White "had gotten physical with the caller and had prior aggression toward law enforcement."  R. 148.  Cabrera testified that White maintained a "[v]ery aggressive" demeanor throughout the encounter.  R. 143.

Three additional officers responded to the scene, including Deputy Burnett.  While Cabrera stood in front of White, the other officers, in uniform and displaying badges, approached

---

[2] We recite the facts in the light most favorable to the Commonwealth, the prevailing party in the trial court.  *Pereira v. Commonwealth*, 83 Va. App. 431, 439 n.3 (2025).

[3] The record contains Exh. CA 1–Cabrera Bodycam and Exh. Deft. 2–Wawa Video.

White from the side and ordered him to comply. R. 140, 153-54. After White again refused to comply, Burnett went "hands on" because "[s]omebody needed to take [him] into custody[.]" R. 154-55. Burnett lunged toward White, White bounced off a nearby car, and a physical struggle followed. R. 164.

During the struggle, Burnett sustained an "open cut" on his wrist that was "actively bleeding." R. 160. When asked where the cut came from, Deputy Burnett testified: "It came from having to grapple against each other on the car at the beginning of the initial video," when "it was just one on one, me and him at the beginning of the video." R. 160. When defense counsel, however, asked, "Do you recall a specific thing he did that caused the scratch?" Deputy Burnett responded: "No." "The noncompliance obviously when I went initial hands on with him, and the time that we were one on one grappling with each other before other deputies came and assisted." R. 166. White also suffered a bleeding cut to his forehead, which Burnett first noticed after White's head struck Burnett's chest. R. 164-65. Burnett testified that he was wearing a body camera with "edges that [were] sharp enough to cause a fairly large gash on somebody's head." R. 165. Deputy Burnett testified that his body-worn camera "also has the same corner edges on all four. They are pretty sharp." R. 165. At the preliminary hearing, when asked whether there was "a moment when [White] came at you with a weapon or his nails or something, something specific," Deputy Burnett acknowledged that he did not recall any such specific action. R. 165.

The other three officers, including Deputy Cabrera, joined Burnett in attempting to subdue White. The officers had requested Cabrera's assistance after struggling to handcuff White themselves. R. 156. Cabrera quickly joined after he "put[] up [his] K-9 partner." R.141, 156. While the officers attempted to cuff him, White "kick[ed] and thrash[ed] around . . . trying to get back up or throw [the deputies] off in a certain direction." R. 157. White also "tens[ed]

up" and tried to keep his arms from being restrained, holding one arm beneath his body and extending the other under a car. R. 156-57. Deputy Burnett testified that White was "tilted on his right side. He [was] tucking his right arm away from us, trying to put his left arm almost underneath the car." R. 158. Ultimately, all four deputies were able to subdue and handcuff White.

After he was handcuffed, White threatened to kill the officers and their families. He stated that he "wished he had something on him so that he could kill [the officers]." R. 149. His threats "continued on and on pretty much until [he] got halfway to jail[.]" R. 143, 149, 159.

The Commonwealth charged White with felony assault and battery of a law enforcement officer under Code § 18.2-57 and two misdemeanor counts of obstruction of justice—one count with threat or force, and one with no threat or force—under Code § 18.2-460. R. 1, 39, 42. At a bench trial, Deputies Cabrera and Burnett testified on behalf of the Commonwealth. Sergeant Grasso, a supervisor who responded to the scene after White was in custody, also testified. R. 173.

At the close of the Commonwealth's evidence, White moved to strike all three counts for insufficient evidence. R. 176. White argued that the Commonwealth failed to prove an assault and that his conduct merely frustrated the deputies rather than obstructing them. R. 179-81. Defense counsel argued that "there has been testimony from the officer that during this grappling as he said, Mr. White, along with other people were being moved around by other people," and that "the video fairly clearly shows" White was "being moved by the police officers a lot more than he is actually moving himself." R. 196-98. Counsel contended there were "many other hypotheses for how that scratch got there," including "the body worn camera," "the license plate," "the concrete itself," and "the other officers." R. 199. The trial court denied the motion. White presented no evidence.

- 4 -

The court found White guilty on all three counts. On the assault and battery charge, the trial court explained that White "fought four officers for about two and a half to three minutes." R. 206. The court noted that White hurt Deputy Burnett "not real bad, but it is still assault and battery on a law enforcement officer." R. 206. The trial court also stated:

> When the first deputy approached you with the dog, you told him I'm not going to comply. And they can't walk away. They can't say okay, well, we'll check back with you another day. They have a job to do. Their job is to arrest you and take you into custody. You were told by them to get on the ground and you said no. . . . [A]nd you are not privileged to do that.

R. 205-06.

On January 30, 2024, the trial court sentenced White to 5 years of imprisonment on the assault and battery charge, with 3 years suspended; 12 months of imprisonment for obstruction of justice with force or threat; and 3 months for obstruction without force. R. 234. The trial court stated that the "suspended time is conditioned on five years good behavior" and that there was "no point in putting [White] on probation," instead "[i]t's good behavior when [White] get[s] out." R. 234-35. In the written sentencing order entered the same day, the trial court reiterated that "suspension of the sentences is conditioned upon . . . good behavior for a period of Five (5) years upon release from said incarceration," and noted that White was "not placed on supervised probation." R. 107.

ANALYSIS

On appeal, White argues that the trial court erred in denying his motion to strike the assault and battery and obstruction of justice charges because the evidence was insufficient to support his convictions. He further contends that the court exceeded its statutory authority under Code § 19.2-303 by imposing a five-year post-incarceration condition of good behavior.

- 5 -

## I. Motion to Strike

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). The only relevant question for this Court "is . . . whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (alteration in original) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

### A. *Assault and Battery of a Law Enforcement Officer*

The trial court convicted White of assault and battery against Deputy Burnett under Code § 18.2-57(C). That statute provides, in pertinent part, "if any person commits an assault or an assault and battery against another knowing or having reason to know that such other person is . . . a law-enforcement officer . . . such person shall be guilty of a Class 6 felony[.]" *Id.*

"The crime of assault and the crime of battery are independent criminal acts, although they are linked in Code § 18.2-57." *Parish v. Commonwealth*, 56 Va. App. 324, 329 (2010). The Code does not define either assault or battery; instead, both are defined by common law. *See Marshall v. Commonwealth*, 69 Va. App. 648, 655 (2019) ("[W]e assume the General Assembly intended to incorporate the common law definition."). Virginia caselaw has established that an assault

> [O]ccurs when an assailant engages in an overt act intended to inflict bodily harm and has the present ability to inflict such harm *or* engages in an overt act intended to place the victim in fear or apprehension of bodily harm and creates such reasonable fear or apprehension in the victim.

*Carter v. Commonwealth*, 269 Va. 44, 47 (2005).

A battery requires "wil[l]ful or unlawful touching of another" and "actual intention or an intention imputed by law." *Parish*, 56 Va. App. at 330 (alteration in original) (quoting *Wood v. Commonwealth*, 149 Va. 401, 404 (1927)). "Determining a defendant's intent 'is a factual question, which lies peculiarly within the province of the [finder of fact].'" *Barnett v.*

- 6 -

*Commonwealth*, 73 Va. App. 111, 120 (2021) (quoting *Hughes v. Commonwealth*, 18 Va. App. 510, 519 (1994) (en banc)).  "Proving intent by direct evidence often is impossible."  *Adams v. Commonwealth*, 33 Va. App. 463, 470 (2000).  "Like any other element of a crime, it may be proved by circumstantial evidence[.]"  *Id.* at 471.  "Circumstantial evidence of intent may include the conduct and statements of the alleged offender, and 'the finder of fact may infer that [he] intends the natural and probable consequences of his acts.'"  *Id.* (alteration in original) (quoting *Campbell v. Commonwealth*, 12 Va. App. 476, 484 (1991) (en banc)).  Even "[t]he slightest touching of another . . . if done in a rude, insolent or angry manner, constitutes a battery[.]"  *Kelley v. Commonwealth*, 69 Va. App. 617, 628 (2019) (alterations in original) (quoting *Adams*, 33 Va. App. at 469).

White contends that his acts toward Deputy Burnett lacked the intent required for battery and the overt act necessary for assault.  White's conduct, however, parallels that of the appellant in *Blankenship v. Commonwealth*, 71 Va. App. 608 (2020).  In *Blankenship*, this Court upheld an assault and battery conviction, finding both an overt act and an intent to do bodily harm.  *Id.* at 621-22.  Blankenship's acts, including shaking and clenching his fists, taking a fighting stance, and refusing to comply, constituted "overt acts" that "demonstrate[d] his intent to place [the officers] in fear of bodily harm, which caused the officers to actually and reasonably fear bodily harm."  *Id.*  Although "words *alone* are never sufficient to constitute an assault," this Court emphasized that "overt acts, accompanied by Blankenship's threatening statements, demonstrated an intent to cause a fear of bodily harm."  *Id.* (emphasis added) (quoting *Clark v. Commonwealth*, 54 Va. App. 120, 129 (2009)); *see also Clark*, 54 Va. App. at 129 ("[W]ords are never spoken in a vacuum, and they cannot be utterly divorced from past conduct, or from the accompanying circumstances." (quoting Restatement (Second) of Torts § 31 cmt. d (1965))).

White's overt acts mirrored those of Blankenship. White repeatedly refused law-enforcement commands, raised his fists with his middle fingers extended, and assumed a fighting stance. As in *Blankenship*, the officers were in uniform, identified themselves, and sought White's compliance with a lawful arrest. Cabrera approached White with the intent to arrest him based on "outstanding warrants" and a recently reported domestic violence incident.[4] R. 137-38.

Given White's threatening stance, profanity, and refusal to comply, the officers testified that they perceived an imminent threat and feared an altercation during the arrest. Such perceptions were objectively reasonable in the context of an arrest, and the officers' attempt to arrest White in fact led to an altercation. Also, White's "overt acts demonstrate his intent to place [the officers] in fear of bodily harm[.]" *Blankenship*, 71 Va. App. at 621; *see also Parish*, 56 Va. App. at 332 ("[I]ntent may be inferred from the nature of the overt act and the surrounding circumstances."). Thus, the factfinder had sufficient evidence to find that White's overt acts and intent met the conditions for an assault and battery conviction.

White nonetheless maintains that no assault occurred against Burnett, the identified victim in the warrant, because White's "refusal to comply, hand gestures, and other actions were all directed at Deputy Cabrera." Op. Br. 11. That contention fails, however, because the warrant's identification of Burnett as the victim does not affect the analysis where White's overt acts were committed in Burnett's presence and gave rise to a reasonable apprehension of bodily harm. Burnett testified that he witnessed White "tak[e] a physical stance of aggression to Deputy Cabrera," raise his "two middle fingers," and state "something in the nature of 'F you, I'm not going to comply.'" R. 152. In addition, Deputy Burnett and the other officers who approached

---

[4] White did not challenge the lawfulness of the arrest; his sufficiency arguments are limited to whether his conduct constituted assault and battery and obstruction of justice. R. 177.

from White's side with their guns drawn also gave verbal commands that White refused. Instead, White continued his overt acts. R. 153-54.

In *Blankenship*, the officers "were concerned" Blankenship would "lung[e] at or punch[] one of the officers." 71 Va. App. at 622. The court found that the overt acts "demonstrate[d] his intent to place [both officers] in fear of bodily harm[.]" *Id.* at 621. In *Blankenship,* the officers feared that whoever approached the defendant would sustain bodily harm. The same is true here. Both Burnett and Cabrera feared harm due to White's aggressive actions. Although some of White's actions were directed toward Deputy Cabrera, with the other officers positioned to White's side, a factfinder could reasonably conclude that White's overt acts were intended to intimidate or create fear in any officer trying to take him into custody, including Burnett, who was the first officer to go "hands-on."

White also argues that *Bennett v. Commonwealth*, 35 Va. App. 442, 447 (2001), controls the assault charge—a case finding no overt action. *Bennett*, however, is distinguishable. In that case, Bennett had requested law enforcement investigate an "incident involving juveniles who had created a disturbance by shouting obscenities and making threats while driving by Bennett's home." *Id.* at 446. While investigating the incident, officers learned that Bennett had chased the juveniles at high speed and brandished a firearm. Shortly after, deputies came to Bennett's home to question him about the incident. Bennett's daughter let the deputies in. Bennett, who was on the telephone at the time, yelled at the officers to "get out of the house," "shout[ed] profanities," and stated that "if [the officers] didn't leave, it would be an 'F'ing blood bath.[']" *Id.* at 446-47. The officers conceded that they were "investigating" the brandishing allegation and had no reason to arrest Bennett. This Court found Bennett's actions insufficient to constitute assault, explaining that Bennett "made no overt act or attempt to physically harm either officer during the time they remained in his home after being asked to leave." *Id.* at 449-50.

This case is distinguishable from *Barrett* in two important respects. First, in *Bennett*, the officers performed an investigative function and had no reason to arrest the suspect. Here, Cabrera approached White with the intent to arrest due to "outstanding warrants" and the reported domestic violence "incident that had just occurred."[5] R. 137-38. As the officers here had a duty to arrest White, White's actions (shaking and clenching his fists, taking a fighting stance, and refusing to comply) demonstrated White's intent to place the officers in fear of bodily harm if they confronted him. Second, *Bennett* "made no threatening gestures" or "attempt[s] to physically harm either officer." 35 Va. App. at 449. Nor did Bennett make any physical movement toward the officers. By contrast, White made threatening gestures and adopted a fighting stance. Defense counsel relied on Bennett, arguing there was "nothing specific that Mr. White did to Deputy Burnett" and that White's conduct "did not say that it happened at the very beginning of the encounter." R. 177, 196. Unlike in *Bennett*, where the officers were investigating and had no reason to arrest the defendant, the officers here had a duty to arrest White based on outstanding warrants and the reported domestic violence incident. R. 137-38.

With respect to the battery, the evidence here is stronger than that presented in *Blankenship*. Although a battery does not require an injury, *Adams*, 33 Va. App. at 468, Burnett incurred an actively bleeding scratch during his struggle with White. White asserts that Burnett could not say with certainty whether a specific action of White's caused the scratch and that any touching of Burnett was unintentional. The trial court did not need to accept White's argument that any touching was unintentional. In *Adams*, this Court found that the trial court was entitled

---

[5] *See* Code § 19.2-81.3(B) ("A law-enforcement officer having probable cause to believe that a violation of [Code] § 18.2-57.2 [assault and battery against a family or household member,] . . . has occurred shall arrest and take into custody the person he has probable cause to believe, based on the totality of the circumstances, was the predominant physical aggressor[.]").

to reject an appellant's testimony that touching an officer was unintentional. *Id.* at 471. Further, "where there is physical injury to another person, it is sufficient that the cause is set in motion by the defendant, or that the [victim] is subjected to its operation by means of any act or control which the defendant exerts." *Banovitch v. Commonwealth*, 196 Va. 210, 219 (1954) (quoting *Commonwealth v. Stratton*, 114 Mass. 303, 305 (1873)). White set in motion a physical struggle involving willful bodily contact that caused Burnett's injury. Thus, it is of no consequence whether White directly inflicted the scratch or whether the injury resulted from the willful physical struggle White set in motion.

The Commonwealth argued at trial that the factfinder could "infer the defendant's intent from all of the circumstances and from his actions." R. 193. The Commonwealth emphasized that White "kn[ew] the deputies are law enforcement," they were "all in uniform displaying their badge of authority," and White "ha[d] no intention of complying with law enforcement." R. 193. The Commonwealth stressed that Deputy Burnett testified White "was very strong, even overcoming Deputy Burnett's strength," and "appeared to have control over his limbs during the interaction." R. 193-94.

Defense counsel countered that "there has been a lot of talk about mens rea and whether the intent to not comply, possibly turn into intent to assault, and I don't think it can." R. 196. Counsel argued White was "simply trying his best not to get hurt." R. 197-98.

During argument on the motion to strike, the trial court asked: "if he is fighting a person who is resisting arrest and he is injured in that fight, is that legally chargeable to the defendant?" R. 194-95. The Commonwealth responded that the injury was "caused by the defendant in the context of his refusal to be arrested" and was "conduct that was intended by the defendant." R. 195. Considering White's conduct and statements just before the altercation, the finder of fact had sufficient evidence to "infer that [White] intend[ed] the natural and probable consequences

of his acts." *Adams*, 33 Va. App. at 471 (quoting *Campbell*, 12 Va. App. at 484). An injury to an officer attempting to effectuate an arrest was a natural and probable consequence of White's failure to comply, his shouting profanities at officers, and taking a fighting stance.

Given White's acts and the context surrounding his arrest, a rational trier of fact could have found the essential elements of assault and battery on a law enforcement officer beyond a reasonable doubt.

### B. *Obstruction of Justice*

Additionally, the trial court convicted White of two counts of obstruction of justice under Code § 18.2-460. The first count requires proving that a defendant "by threats or force, knowingly attempt[] to intimidate or impede . . . any law enforcement officer . . . lawfully engaged in his duties as such[.]" Code § 18.2-460(B). R. 39. The second count requires that White "knowingly obstruct[ed] . . . a law-enforcement officer . . . in the performance of duties as such, or fail[ed] or refuse[d] without just cause to cease such obstruction when requested to do so[.]" Code § 18.2-460(A). R. 42.

### 1. Obstruction with Threats or Force Under Code § 18.2-460(B)

Obstruction of justice occurs when someone, "by threats or force, knowingly attempts to intimidate or impede . . . any law-enforcement officer, . . . lawfully engaged in his duties as such[.]" Code § 18.2-460(B). The two elements are "knowingly attempt[ing] to impede an officer and that [the defendant] used threat or force." *Hamilton v. Commonwealth*, 69 Va. App. 176, 196 (2018).

White first argues that his conduct lacked the force necessary for a conviction under the statute. The force requirement is the use of "[p]ower, violence, or pressure directed against a person or thing." *Jordan v. Commonwealth*, 273 Va. 639, 648 (2007) (alteration in original) (quoting *Black's Law Dictionary* 673 (8th ed. 2004)). White asserts that his case is "directly analogous" to *Jordan* with respect to "the force necessary for a conviction for obstruction of justice." In *Jordan*,

- 12 -

an officer arrested the defendant for DUI and later attempted to handcuff him after discovering that he had retrieved confiscated cash. 273 Va. at 643. Jordan responded by "stiffen[ing] his arms and began pulling away" when the officer attempted to restrain him. *Id.* at 643-44. The Supreme Court of Virginia found that Jordan's actions in removing the roll of cash, stiffening, and pulling away from being cuffed were insufficient to establish force under Code § 18.2-460(C). *Id.* at 647-48. The Court stated that Jordan was "[u]nquestionably . . . less than cooperative and his conduct rendered Officer Kern's discharge of his duties more difficult, but Jordan's conduct again did not involve the use of force." *Id.* at 649.

White's conduct is distinguishable from that in *Jordan*. In *Jordan*, the Supreme Court found that a defendant who "stiffen[ed] his arms and began pulling away" when officers attempted to handcuff him, walked slowly and pulled away repeatedly requiring the officer "to pin Jordan against a door or wall several times," and "stopped repeatedly, causing Officer Kern to bump into him" did not use sufficient "force" for obstruction. 273 Va. at 643-44, 648 (alteration in original).

White argues his case is "directly analogous" to *Jordan*, contending that his conduct constituted mere passive resistance. Op. Br. 16. Unlike Jordan's conduct in stiffening his arms and pulling away, however, White shouted profanities ("Fuck you. I'm not going to comply"), took a fighting stance with middle fingers extended, and engaged in what Deputy Burnett described as a "wrestling match." R. 156, 164. After Deputy Burnett went "hands on," White "turned directly back in towards [Deputy Burnett] and a wrestling match ensued to where he was eventually taken to the ground by all of us." R. 156.

Once on the ground, White continued active resistance. He was "kicking and thrashing around . . . trying to get back up or throw [the deputies] off in a certain direction." R. 157. White "tens[ed] up" and attempted to keep his arms from being handcuffed by tucking "his right arm away from us, trying to put his left arm almost underneath the car." R. 158. Deputy Burnett

- 13 -

testified the struggle on the ground lasted "about a minute and a half if not longer." R. 157. It ultimately required four deputies to subdue and handcuff White. R. 156-59. This sustained, active physical resistance—including a wrestling match, kicking, thrashing, and tensing to avoid restraint—goes beyond Jordan's passive stiffening and pulling away and constitutes "force" under Code § 18.2-460(B).[6]

Second, White argues that the evidence was insufficient to establish that he had the requisite intent to impede. White also asserts that the "specific intent to impede the officers does not flow naturally from [his] conduct." Op. Br. 19. To violate Code § 18.2-460(B), "the defendant must intend to impede an officer 'in the performance of his duties.'" *Craddock v. Commonwealth*, 40 Va. App. 539, 552 (2003) (quoting *Woodson v. Commonwealth*, 14 Va. App. 787, 795 (1992)).

Intent to impede "may be shown by [the defendant's] statements or conduct." *Polk v. Commonwealth*, 4 Va. App. 590, 595 (1987). Further, "[i]ntent is a factual determination, and a trial court's decision on the question of intent is accorded great deference on appeal and will not be reversed unless clearly erroneous." *Towler v. Commonwealth*, 59 Va. App. 284, 297 (2011). Here, the trial court expressly found that White intended to resist arrest and impede the officers, stating:

> You decided that you were not going to be taken down and you fought those guys. You fought four of them. It took four police officers to handcuff you . . . [I]s it assault and battery when you fight somebody trying to avoid being arrested? It is.

---

[6] White's case is also distinguishable from *Belton v. Commonwealth*, No. 1290-06-2, slip op. at 8, 2007 Va. App. LEXIS 391, at *12 (2007), an unpublished case from this Court that White cites for the same proposition. In that case, the Court found "no substantive difference between Jordan's use of force and [Belton's]" repeated refusal to put his hands behind his back as ordered by officers. *Id.* For the reasons stated, White's use of force far exceeded Belton's refusal to put his hands behind his back.

- 14 -

R. 233. The officers had a duty to investigate the reported domestic violence incident and to arrest White. White's statements and conduct support the trial court's conclusion that he intended to impede the officers in those duties. White demonstrated that intent through his profanity-laced refusals to comply, assumption of a fighting stance, and sustained physical resistance—including kicking, thrashing, tensing his body, and maneuvering his arms to avoid restraint—such that four officers were required to subdue and handcuff him. Further, Burnett testified that, even after officers took White into custody, White continued threatening to kill the officers and their families, which persisted halfway to the jail. R. 156-59.

Viewed in its entirety, the evidence was sufficient to permit a rational factfinder to conclude beyond a reasonable doubt that White knowingly attempted to impede law enforcement officers through the use of force, in violation of Code § 18.2-460(B).

### 2. Obstruction without Threats or Force Under Code § 18.2-460(A)

The second obstruction of justice count charges White with "knowingly obstruct[ing] a . . . law-enforcement officer . . . in the performance of his duties as such or fail[ing] or refus[ing] without just cause to cease such obstruction when requested to do so[.]" Code § 18.2-460(A). White argues that the Commonwealth must prove "actual obstruction," asserting that his actions "merely made the deputies' discharge of [their] duties 'more difficult, but achievable.'" Op. Br. 21 (quoting *Thorne v. Commonwealth*, 66 Va. App. 248, 255 (2016)).

Obstruction under Code § 18.2-460(A) may be proved by acts that are "either active or passive." *Thorne*, 66 Va. App. at 255. Passive obstruction occurs "where the officer seeks to make the defendant act directly[,] and the defendant refuses or fails to act as required." *Id.* (quoting *DiPino v. Davis*, 729 A.2d 354, 361-62 (Md. 1999)). Passive obstruction may become active when the officer is forced to escalate his efforts to "act[] directly against the defendant . . . and is physically resisted." *Id.* (quoting *DiPino*, 729 A.2d at 361-62).

- 15 -

As supported by the record, the officers had a lawful duty to take White into police custody. White's repeated refusals to comply, profanity-laced statements, and fighting stance forced officers to escalate from verbal commands to physical force, which White actively resisted—converting passive obstruction into active obstruction.

This Court has consistently held that a "conviction for obstruction of justice cannot be sustained merely on evidence that 'a person fail[ed] to cooperate fully with an officer or when the person's conduct merely render[ed] the officer's task more difficult but [did] not impede or prevent the officer from performing that task.'" *Lucas v. Commonwealth*, 75 Va. App. 334, 344 (2022) (alterations in original) (quoting *Ruckman v. Commonwealth*, 28 Va. App. 428, 429 (1998)). Similarly, flight or evasive conduct alone, such as hiding or running away, is insufficient to establish obstruction. *Atkins v. Commonwealth*, 54 Va. App. 340, 343 (2009) ("[A]n accused's hiding or seeking 'to escape [an] officer by merely running away [is] not such an obstruction as the law contemplates.'" (second and third alterations in original) (quoting *Ruckman*, 28 Va. App. at 430)).

White's conduct, however, went beyond mere noncooperation, flight, or evasion and more closely resembles *Lucas*, 75 Va. App. 334, *Doscoli v. Commonwealth*, 66 Va. App. 419 (2016), and *Molinet v. Commonwealth*, 65 Va. App. 572 (2015). In *Lucas*, this Court found sufficient evidence for obstruction where Lucas's actions "caused Officers Robinson and Weeks to engage in a scuffle with him in the street" to handcuff and detain him. 75 Va. App. at 345.

In *Doscoli*, officers investigated a potential incident of domestic violence. When they tried to speak to an injured resident, Doscoli "burst out of his apartment into the common area [aggressively and angrily] while shouting and cursing," "remained belligerent, aggressive, and uncooperative," and "actively sought to prevent the officers from conversing with [the injured party]." *Doscoli*, 66 Va. App. at 430. This Court found sufficient evidence to convict Doscoli of

obstruction. Similarly, in *Molinet*, this Court found obstruction where evidence showed that Molinet "fail[ed] to follow instructions . . . multiple times" and "stepped toward [the officer] in an aggressive, threatening, and angry manner while shouting and cursing." 65 Va. App. at 580.

As in *Lucas*, White's conduct led officers to engage in a physical struggle to detain him. As in *Doscoli*, White's "[v]ery aggressive demeanor" prevented the officers from responding to the reported victim of the alleged domestic violence incident. As in *Molinet*, White took an "aggressive" "fighting stance" while shouting and cursing at the officers. White's actions not only made the officers' tasks of arresting him and investigating the domestic violence incident[7] more difficult, but also impeded them from performing those duties. The record thus permits a rational factfinder to conclude beyond a reasonable doubt that White knowingly obstructed the officers in the performance of their duties, without the use of force, in violation of Code § 18.2-460(A).

## II. Good Behavior

White lastly argues that his sentence exceeded the statutory maximum under Code § 19.2-303, which provides, in pertinent part:

> The court may fix the period of probation for up to the statutory maximum period for which the defendant might originally have been sentenced to be imprisoned. Any period of supervised probation shall not exceed five years from the release of the defendant from any active period of incarceration.

---

[7] During oral argument, the Commonwealth asserted that the Wawa video shows that officers could not secure the scene and speak with the victim until after White had been handcuffed and placed in a police car. Before that time, White remained at her vehicle where officers confronted him. Deputy Cabrera testified that "[t]he victim had remained on scene" and informed dispatch that White "was at her vehicle." R. 137. Similarly, Deputy Burnett testified that the victim "call[ed] from inside of her car saying that [White] was wandering around outside drinking on the hood of the vehicle." R. 151. Thus, White's actions obstructed the officers from investigating the reported incident of domestic violence.

- 17 -

As amended effective July 1, 2021, this statute establishes a substantive outer limit on the period of suspension that may be imposed. *See Lane v. Commonwealth*, No. 0455-22-1, slip op. at 10, 2023 Va. App. LEXIS 136, at *13 (Feb. 28, 2023) ("Similarly, as amended, Code § 19.2-303 limits the imposition of indeterminate probation to five years and 'involves a substantive right to be free of harsher penalty.'"[8] (quoting *Gionis v. Commonwealth*, 76 Va. App. 1, 16 (2022))).[9]

White acknowledges that he failed to preserve his Code § 19.2-303 argument for appeal, but asserts that the ends-of-justice exception applies because an unlawful extension of post-incarceration restraint constitutes a deprivation of liberty. *See* Rule 5A:18. He also argues that the sentencing order is void ab initio because the trial court lacked authority to impose a period of suspension exceeding the statutory maximum. The Commonwealth counters that any

---

[8] The dissent contends that our reading of Code §§ 19.2-303 and 19.2-303.1—namely, that they do not permit a sentencing order to impose a post-release good-behavior condition that extends the court's enforceable restraint beyond the statutory maximum—impermissibly "adds language" to those statutes. *See* Dissent at 33. It does not. Rather, we enforce the statutes according to their terms, consistent with binding precedent and settled rules of statutory construction. "Probation is purely a creature of statute, a policy choice shaped by the General Assembly and administered through the courts," and "[c]ourts have no inherent authority to suspend the execution of sentences or to impose probation conditions outside the parameters of the Virginia Code." *Hannah v. Commonwealth*, 303 Va. 106, 119 (2024). Likewise, this Court has recognized that statutory limits on suspension periods must be enforced as written. *Cisneros v. Commonwealth*, 82 Va. App. 147, 168 (2024) ("Code §19.2-306(C) also limits the maximum length of the suspension period, measured from the date of the original sentence." (emphasis added)). This Court also may not "add to the words" of a statute under the guise of statutory interpretation or enlarge sentencing authority beyond what the General Assembly has expressly conferred. *Heald v. Rappahannock Elec. Coop.*, 80 Va. App. 53, 75 (2024) (quoting *Berglund Chevrolet, Inc. v. Va. Dep't of Motor Vehicles*, 71 Va. App. 747, 753 (2020)). If the General Assembly intended to authorize a broader period of post-incarceration restraint, it could have done so expressly.

[9] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Fergeson v. Commonwealth*, 84 Va. App. 80, 94 n.5 (2025) (quoting *Jones v. Commonwealth*, 71 Va. App. 375, 382 n.2 (2019)).

error is voidable,[10] not void ab initio. For the reasons stated below, we conclude that the

sentencing order, on its face, authorizes a fixed period of post-release conditioned suspension

that, when combined with White's active incarceration, exceeds the statutory ceiling on

post-release supervisory authority under Code § 19.2-303. Since the order's own terms alone

produce that excess without speculation about future events, the sentencing order is void ab

initio, and the ends-of-justice exception to Rule 5A:18 applies independently.[11]

On January 30, 2024, the trial court sentenced White to 5 years for assault and battery

and 15 months for the two misdemeanor obstruction charges. In calculating the statutory

---

[10] The Commonwealth relies on *Hannah v. Commonwealth*, 303 Va. 106, to argue that the sentence is merely voidable. That reliance is misplaced. In *Hannah*, the Supreme Court of Virginia addressed revocation proceedings and declined to extend *Rawls v. Commonwealth*, 278 Va. 213 (2009), "beyond initial sentencing to revocation proceedings and resuspensions" to retroactively apply Code § 19.2-306(C). *Hannah*, 303 Va. at 121. *Hannah* did not address whether a period of suspension exceeding the statutory maximum renders a final order voidable or void ab initio, the principal reason for which we discuss *Rawls* below. Moreover, the statute at issue in *Hannah* governs revocation proceedings, while this case concerns initial sentencing authority under Code §§ 19.2-303 and -303.1 ("Fixing period of suspension").

*Rawls*, by contrast, addressed criminal defendants whose punishments were fixed at initial sentencing in violation of the statutorily prescribed ranges and held that "a sentence imposed in violation of a prescribed statutory range of punishment is void ab initio." 278 Va. at 221. Because *Hannah* neither involved initial sentencing nor resolved the void or voidable distinction presented here, *Rawls* controls.

We also note that in *Story v. Commonwealth*, No. 1794-23-4, slip op. at 8-9, 2025 Va. App. LEXIS 201, at *12-13 (Apr. 8, 2025), cited in the dissent, this Court characterized a misapplication of Code § 19.2-303 at initial sentencing as producing a voidable order. As an unpublished decision, *Story* is persuasive only and not binding on this Court. *See Fergeson v. Commonwealth*, 84 Va. App. 80, 94 n.5 (2025). However, *Story* resolved the void or voidable question by applying *Hannah*'s reasoning to Code § 19.2-303, without considering whether the order's fixed terms alone resulted in excess calculable without speculation about future events. When an order specifies a fixed start point and a fixed duration with no discretionary release mechanism, the excess is not speculative—it is clearly ascertainable from the order itself. *Story* did not address, and therefore does not foreclose, the void ab initio consequence that arises when a sentencing order's own fixed terms produce excess that is calculable without speculation about future events.

[11] The seriousness of White's conduct and his criminal history, while relevant to the trial court's discretionary sentencing choices within statutory bounds, cannot expand the court's statutory authority. Even grave facts do not permit a sentencing court to impose post-incarceration restraints exceeding the limits set by the General Assembly.

maximum under Code § 19.2-303, the court must consider "the cumulative total of all *potential* maximum sentences, running consecutively[.]" *Barrow v. Commonwealth*, 81 Va. App. 535, 549 (2024) (emphasis added); *see also id.* at 552 ("[T]he trial court no longer had the authority to order an additional period of suspension and probation after Barrow's release. This is so because the cumulative maximum penalty which Barrow could have been punished for his unlawful wounding and possession of a firearm offenses was ten years."). White received the maximum sentence for assault and battery—five years. He received the maximum for obstruction with force—12 months. He received less than the maximum for obstruction without force—3 instead of 12 months.[12] Accordingly, White's "potential maximum sentences, running consecutively," would total 7 years.

The sentencing order in this case is neither open-ended nor indeterminate. It conditions suspension on "five (5) years of good behavior *upon release* from said incarceration" and contains no provision for earlier discharge by the court or probation officer. R. 107 (emphasis added). This fixed, post-release framework is materially distinguishable from an order that grants the court discretion to terminate supervision before reaching any statutory limit. In *Commonwealth v. Moncrea*, ____ Va. ____, ____ (Apr. 2, 2026), the Supreme Court of Virginia declined to find facial error in a sentencing order that imposed open-ended probation "until released by the Court or the Probation Officer," reasoning that the court's retained discretion precluded a determination of excess. This reasoning is not applicable here. White's order specifies both the commencement point—release from his active term of three years and three months—and a fixed duration of five years, and it contains no discretionary release mechanism.

---

[12] White's two obstruction convictions under Code § 18.2-460 were both Class 1 misdemeanors carrying a maximum jail sentence of 12 months. Code §§ 18.2-460, 18.2-11(a). Op. Br. 24 n.10.

Therefore, the excess authorized is calculable from the order's own terms, without reliance on potential future discretion.

Our holding does not depend on a formula for subtracting active time from the suspension period, as the dissent suggests. Rather, it enforces the statutory ceiling against a sentencing order that, on its face, is structured to impose a fixed five-year period of conditioned suspension beginning upon release, without regard to the length of the active sentence. Thus, the maximum period of suspension the trial court could lawfully impose, whether conditioned on probation or good behavior, was seven years.

Here, the sentencing order conditions the suspension of White's sentences on "five (5) years [of] good behavior upon release from said incarceration," without placing White on supervised probation.[13] Since the order ties the condition to a five-year period beginning upon release, it authorizes a period of enforceable post-release restraint in addition to White's active incarceration. If White serves his active term of three years and three months, the order would then subject him to five additional years of conditioned suspension after release, which exceeds the seven-year statutory maximum.[14] A sentencing order that, on its face, authorizes a fixed period of conditioned suspension that—by operation of its own terms—produces enforceable post-release restraint exceeding the statutory ceiling on post-release supervisory authority is void ab initio because the defect lies in the unlawful authorization itself, regardless of whether excess supervision ultimately occurs. *See Rawls v. Commonwealth*, 278 Va. 213, 221 (2009) ("[A] sentence imposed in violation of a prescribed statutory range of punishment is void ab initio

---

[13] Although the court expressly declined to impose supervised probation, conditions of suspension, including good behavior, remain subject to statutory limits including those under Code § 19.2-303.

[14] Any active incarceration longer than two years combined with the five-year good behavior period would exceed the statutory maximum of seven years.

because 'the character of the judgment was not as such as the [C]ourt had the power to render.'" (alteration in original) (quoting *Anthony v. Casey*, 83 Va. 338, 340 (1887))).[15] We observe that *Rawls* itself issued a sentence that exceeded the statutory maximum term of imprisonment for the underlying offense, representing a more direct instance of the same defect. The principle it articulates—that an order exceeding legislatively prescribed limits is void ab initio—applies equally when the limit prescribed is the ceiling on post-release supervisory authority under Code § 19.2-303, as that ceiling delineates the outer boundary of the court's enforceable power over White's liberty following release.[16]

The Commonwealth concedes that White's sentencing order *could* result in supervision beyond the statutory maximum. A'ee Br. 22. It nonetheless argues that excess supervision "may never come to pass" due to potential credits White could receive, including five months of credit

---

[15] The defect is the order's authorization of a period of conditioned restraint beyond the statutory maximum, not the timing label attached to that restraint.

[16] The dissent invokes *Commonwealth v. Watson*, 297 Va. 355 (2019), for the proposition that *Rawls* reaches only a "statutory range of sentences for an offense" challenged as "lying outside that range," and so cannot apply to a condition of good behavior, which the dissent characterizes as an act of grace rather than punishment. *Id.* at 360. *Watson* does not bear that weight. It reaffirmed the very principle on which we rely: once a court "has exhausted all its power to punish," any further exercise is void "because the power to render any further judgment did not exist." *Id.* at 361 (quoting *Ex parte Lange*, 85 U.S. 163, 176 (1873)). That is the defect here. Code § 19.2-303 fixes the outer limit of the court's authority to impose post-release conditioned suspension, and a sentencing order authorizing conditioned restraint beyond that ceiling exercises a power the General Assembly withheld. The formulation the dissent quotes described the question *Watson* answered—whether a court confronting an unlawful term must conduct a new sentencing hearing rather than simply re-impose sentence—not a holding that the void ab initio rule is confined to the active-incarceration component of a sentence and leaves every other express statutory ceiling on sentencing authority beyond its reach. Nor does the dissent's "not punishment" premise alter the analysis. Voidness under *Rawls* and *Watson* turns on whether the court possessed the power to render the judgment, not on the label affixed to the portion exceeding the statutory limit. A condition of suspension enforceable through revocation and reincarceration is an exercise of the court's sentencing authority bounded by Code § 19.2-303; calling it an act of grace does not enlarge that authority. In any event, as explained *supra*, the ends-of-justice exception applies even if the error were deemed voidable rather than void ab initio, so *Watson*'s void-or-voidable taxonomy would not change the result.

he received for time served awaiting trial. The Commonwealth relies on *Hamilton v. Commonwealth*, 79 Va. App. 699, 708 (2024), to argue that White's active sentence does not affect the period of good behavior imposed on White. *See* A'ee Br. 22. *Hamilton*, however, is distinguishable in both posture and the nature of the sentencing issue presented.[17] There, this Court addressed whether a trial court could impose a suspended sentence by aggregating the statutory maximum penalties for multiple offenses when the defendant received less than the maximum active incarceration. *Hamilton*, 79 Va. App. at 706.

The *Hamilton* language cited by the Commonwealth appears in the context of explaining that the trial court's authority was not altered by the defendant's partial service of his sentence and is immediately preceded by the observation that "the trial court's jurisdiction in this case is not changed by the fact that Hamilton has already served a portion of his suspended sentence." *Id.* at 708. This case, however, does not involve a jurisdictional challenge or the effect of time

---

[17] Nothing in this opinion rejects or departs from *Hamilton*. To the contrary, *Hamilton* confirms that the validity of a suspended sentence is not undermined merely because a defendant serves an active term of incarceration. Here, the three-year suspended portion of White's sentence is itself lawful. The defect arises from the additional five-year condition of good behavior measured from White's release, which, when combined with his active incarceration, authorizes an aggregate period of enforceable restraint potentially exceeding the seven-year statutory maximum. *Hamilton* did not consider, and does not authorize, a sentencing order that on its face permits post-incarceration restraint beyond the maximum period under Code § 19.2-303. *See Hamilton*, 79 Va. App. at 706 ("In any case where a court suspends the imposition or execution of a sentence, it may fix the period of suspension for *up to the statutory maximum period* for which the defendant might originally have been sentence to be imprisoned." (emphasis added)).

To the extent *Hamilton*'s statement that "[u]nlike the suspended sentence itself, the *period* of suspension is not affected by the amount of time that a defendant actively serves in prison," *id.* at 708, could be read to foreclose our analysis, that reading is mistaken. *Hamilton* addressed whether a court's authority to impose a suspended sentence is diminished by partial service—it is not. It did not address whether the *structure* of a fixed post-release condition may, by its own terms, produce an enforceable period of restraint exceeding the statutory ceiling. *Barrow v. Commonwealth*, 81 Va. App. at 549, which post-dates *Hamilton*, confirms that the statutory ceiling is measured against "the cumulative total of all *potential* maximum sentences, running consecutively." *Barrow* is the more directly on-point authority and is consistent with our holding.

already served on a suspended sentence. Rather, White argues that the sentencing order, on its face, authorizes a period of post-incarceration restraint, enforceable through revocation, that may exceed the aggregate statutory maximum permitted under Code § 19.2-303. *Hamilton* did not address whether such an order is void or voidable, nor did it consider a sentencing order that, by its terms and at the time of entry, permits post-incarceration restraint beyond the statutory maximum.[18] The Commonwealth's argument that excess supervision "may never come to pass" is speculative and does not cure the facial defect in the sentencing order.

Legality is determined by what the sentencing order authorizes, not by anticipated future events such as sentencing credits or early release. The dissent's contrary position depends entirely on measuring the five-year condition from White's release. The period of suspension, however, is properly measured from the date of the original sentencing order, which is the only fixed reference point in the statutory scheme and the measure the General Assembly made express for the closely related revocation context. *See* Code § 19.2-306(C). Measured from that anchor, an order imposing a fixed five-year condition commencing upon release authorizes enforceable restraint that does not end until roughly eight years and three months after the sentencing order, exceeding the seven-year statutory maximum. The defect is precisely that the order measures the condition from release rather than from the date of the sentencing order,

---

[18] The dissent relies on the fact that Code § 19.2-306(C), governing revocation proceedings, expressly provides that courts "shall measure the period of any suspension of sentence from the date of the entry of the original sentencing order," while Code § 19.2-303, governing initial sentencing, contains no comparable language. That reasoning inverts the statutory structure. Section 19.2-306(C) limits a court's authority at revocation by preventing the addition of new suspension time beyond that originally imposed. The absence of parallel date-measurement language in Code § 19.2-303 does not expand sentencing authority or permit courts to exceed the "statutory maximum period" limit; it reflects that, at initial sentencing, courts retain discretion to structure sentences within that limit. "Courts have no inherent authority to suspend sentences or to impose probation conditions outside the parameters of the Virginia Code." *Hannah*, 303 Va. at 119 ("Probation is purely a creature of statute, a policy choice shaped by the General Assembly and administered through the courts.").

- 24 -

thereby extending the court's enforceable restraint beyond the statutory ceiling. Since White's sentencing order, on its face, permits conditioned suspension exceeding the maximum authorized by Code § 19.2-303, it is unlawful, regardless of how the period is characterized.

Virginia appellate courts have rejected the notion that a sentence exceeding statutory authority may be upheld on the basis of future contingencies. In *Rawls*, the Supreme Court of Virginia held that:

> [A] sentence imposed in violation of a prescribed statutory range of punishment is void *ab initio* because "the character of the judgment was not such as the [C]ourt had the power to render." Thus, a criminal defendant in that situation is entitled to a new sentencing hearing.

278 Va. at 221 (second alteration in original) (quoting *Anthony*, 83 Va. at 340). *Rawls* draws an important distinction between sentences that are void ab initio for exceeding statutory authority and those that are void ab initio for jurisdictional reasons. As *Rawls* explains, "[a] sentence in excess of that prescribed by law is not void ab initio because of the excess, but is good insofar as the power of the court extends, and is invalid only as to the excess." *Id.* at 218. In this case, White's sentence is void ab initio, not because the trial court lacked subject-matter jurisdiction, but because the court lacked authority to impose a period of post-incarceration restraint exceeding the statutory maximum. *See id.* at 221 (explaining that a sentence is void ab initio where "the character of the judgment was not such as the court had the power to render").

The imposition of a good behavior condition is not merely an aspirational admonition as the dissent suggests. Rather, it is a condition of suspension enforceable through revocation, defining the period during which White may be returned to incarceration. Nothing in our holding prevents a trial court from imposing post-release conditions of good behavior or probation. Instead, it requires that the court structure those conditions so that the total period of conditioned suspension authorized by the sentencing order does not exceed the statutory

- 25 -

maximum. Where a defendant serves an active term of incarceration, the permissible post-release period of conditioned suspension is correspondingly limited by the statutory ceiling.[19]

The ends-of-justice exception to Rule 5A:18 applies here on two independent grounds. First, because the sentencing order is void ab initio, denying White relief would result in a grave injustice. As the imposed sentence is void ab initio, the ends-of-justice exception is justified because "denying a defendant his liberty based on a void sentence would impose a grave injustice," as established in *Charles v. Commonwealth*, 270 Va. 14, 20 (2005); *see also Fletcher v. Commonwealth*, 72 Va. App. 493, 511 (2020).[20] Second, even assuming without deciding that the error is deemed voidable rather than void ab initio, the exception still applies because the order facially subjects White to an enforceable post-release restraint, supported by the court's revocation authority, that exceeds the legislative maximum. Charles did not require a void ab initio finding as a prerequisite to apply the exception; it only required that failing to apply the exception would result in a grave injustice. Here, the sentencing order explicitly authorizes the court to revoke White's suspension and reimpose incarceration beyond what Code § 19.2-303

---

[19] Our holding is limited to sentencing orders that, on their face, authorize a period of conditioned suspension exceeding the statutory maximum. It does not disturb sentences that fall within statutory limits or require courts to engage in speculative calculations about how long a defendant may ultimately remain subject to revocation.

[20] A condition of good behavior is itself a restraint on liberty under Virginia law: it is enforceable through revocation and exposes the defendant to reincarceration. *See Diaz-Urruita v. Commonwealth*, 77 Va. App. 182, 192 (2023); *Marshall v. Commonwealth*, 202 Va. 217, 220 (1960).

permits. Affirming that order would impose a grave injustice regardless of whether the error is characterized as void or voidable.[21]

When a sentence is void ab initio, the proper remedy is to remand for resentencing. *Rawls*, 278 Va. at 221; *see also Gordon v. Commonwealth*, 61 Va. App. 682, 688 (2013) ("[T]his Court has no authority to strike the excessive portion of appellant's sentences[.]").[22]

CONCLUSION

For the foregoing reasons, we affirm White's convictions for assault and battery and both counts of obstruction of justice. However, because the sentencing order authorizes a period of suspension conditioned on good behavior that exceeds the statutory maximum and is therefore void ab initio, we vacate the sentence and remand for resentencing within the statutory limits.

*Affirmed in part, vacated in part, and remanded.*

---

[21] The dissent suggests that probation or good-behavior conditions are categorically less significant restraints on liberty than incarceration and attempts to distinguish the federal cases on that basis. *See* Dissent at 36 n.26. Although probation may be "preferable" to "incarceration," that distinction does not alter the dispositive point here: a condition of good behavior is enforceable through revocation and may therefore subject a defendant to additional incarceration. *See Diaz-Urruita*, 77 Va. App. at 192 ("[F]ailure of a defendant to be of good behavior, amounting to substantial misconduct, during the period of suspension would provide reasonable cause for the revocation of the [sentence]." (second alteration in original) (quoting *Marshall*, 202 Va. at 220)). Thus, whatever the comparative severity of probation, a good-behavior condition remains a real restraint on liberty because it defines the period during which the defendant remains subject to revocation and reincarceration.

[22] In *Commonwealth v. Moncrea*, ____ Va. at ____, the Supreme Court of Virginia reversed the Court of Appeals' decision in *Moncrea*, finding no error in a sentencing order imposing open-ended probation "until released by the Court or the Probation Officer." The Court reasoned that the potential for excess was speculative because the trial court maintained future discretion to terminate supervision within the statutory ceiling. That holding does not alter our analysis in this case. White's order imposes a fixed five-year period tied to release, with no discretionary release mechanism. The facial excess in White's order is objectively ascertainable from its terms without speculation, which is precisely what the Supreme Court found absent in the *Moncrea* order.

- 27 -

Beales, J., dissenting in part and concurring in part.

I concur with the majority that Emanuel White's convictions in the trial court should be affirmed. However, the majority concludes that the trial judge erred by conditioning White's suspended sentence on a period of good behavior, even though counsel for White never objected to it in the trial court. The majority would employ the rarely used ends of justice exception to overturn the trial court's sentence although doing so requires finding this is an actual miscarriage of justice. Because I do not believe that simply requiring good behavior of someone (who is already receiving the court's grace through a suspended sentence) could actually constitute a miscarriage of justice and because I do not believe there is even error here in the first place, I must respectfully dissent.

In reaching his sentencing decision, the circuit court judge was faced with the following facts. On March 10, 2023, at 6:15 a.m., Deputy D.M. Cabrera of the Spotsylvania Sheriff's Office responded to a domestic incident involving a physical assault on a woman at a Wawa gas station. R. 135. The woman had reported to dispatch that Emanuel Wayne White—who had outstanding arrest warrants from "multiple agencies with some underlying charges including assault on law enforcement"—had physically assaulted her. R. 137, 151. She also stated that she was inside of her vehicle and that White was standing outside of her vehicle. R. 137, 151.

When Deputy Cabrera arrived, he observed White standing in close proximity to a vehicle. R. CW Ex. 1 at 5:43. When Deputy Cabrera—who was wearing his badge of authority—ordered White to show him his hands, White instead held up both of his middle fingers, took an "aggressive stance," and shouted that he would not comply with Deputy Cabrera's orders. R. 140-44, 193; CW Ex 1 at 6:00. Three other deputies arrived to help Deputy Cabrera. One of the deputies, Deputy Burnett, recalled that "as we were approaching, he [White] was saying I'm not going to comply. I'm not going to comply, saying 'F you' all these vulgar

different things to Deputy Cabrera." R. 155. After White fought with the "four officers for about two and a half to three minutes," the deputies finally managed to subdue White. R. 206. Deputy Cabrera further testified, "Mr. White made some statements saying that he wished he had something with him or on him so that he could have killed us." R. 143; CW Ex 1 at 10:10.

After White was detained and while he was sitting in the police vehicle with the door open waiting for the EMTs to arrive, White continued to yell and say vulgar things to the deputies. CW Ex 1 at 16. After the deputies failed to respond to his repeated vulgar statements, White stepped out of the vehicle and back towards the deputies, forcing the deputies to restrain him again. CW Ex 16-16:30. After he had been restrained yet again, White threatened to kill the families of the deputies. CW Ex 16:15-30.

At the trial court's sentencing of White, the circuit court explained to White that "the reality is you have a history of convictions of violent conduct towards other people." R. 233. The circuit court further noted, "You've been put in jail a bunch of times, but a lot of times you just mostly had suspended time." R. 234. The circuit court then entered an order sentencing White to 5 years of incarceration with 3 years suspended for assault and battery of a law enforcement officer. R. 108-10. The circuit court also sentenced White to 12 months of incarceration for obstruction of justice with force or threat and 3 months for obstruction of justice without force and suspended no time for either of those sentences. R. 106-108. In total, the circuit court sentenced White to 6 years and 3 months of incarceration with 3 years suspended. R. 108. The circuit court conditioned White's suspended sentence on five years of good behavior. R. 108. Trial counsel for White did not object to the circuit court's decision.

I. Conditioning His Suspended Sentence on 5 Years of Good Behavior Was Not Error

Nevertheless, despite White's failure to object and thus comply with this Court's binding Rule 5A:18, the majority finds that the circuit court committed reversible error when it required

- 29 -

White to be of good behavior for five years following his release from incarceration. The majority reaches this conclusion on the basis of two facts: first, that "the maximum period of suspension the trial court could lawfully impose . . . was seven years" and second, that White's 5-year period of good behavior "begin[s] upon release" from incarceration—which allegedly "authorizes a period of enforceable post-release restraint in addition to White's active incarceration" that "exceeds the seven-year statutory maximum." Maj. Op. 21.

To reach this conclusion, the majority assumes that a sentencing court can only condition suspension under Code § 19.2-303 up to the statutory maximum period of incarceration minus the actual period of incarceration served by a defendant.[23] If that were true, the circuit court judge's good behavior condition in this case would indeed violate the statutory maximum available period of suspension because White's period of incarceration (3 years 3 months) when added to the good behavior requirement (five years after release from incarceration) is greater than the statutory maximum period of incarceration for White's offenses (7 years), which is the period of suspension in this case. R. 108.

However, this Court's recent published opinion in *Hamilton v. Commonwealth* precludes this outcome. In *Hamilton*, this Court clearly held, "Unlike the suspended sentence itself, the *period* of suspension is not affected by the amount of time that a defendant actively serves in

---

[23] The majority denies that they are calculating the permissible period of suspension by subtracting a defendant's period of active incarceration from the statutory maximum available period of suspension. However, that is the actual effect of their holding. For example, under the majority's reasoning, the maximum period of active incarceration to which White could have been sentenced in this case (because the circuit court imposed a five-year period of good behavior upon release) would be two years. The majority would also hold that, if the circuit court had imposed seven years of good behavior, the circuit court could not impose any period of active incarceration whatsoever. The majority reaches this conclusion despite the fact the circuit court could have sentenced White to seven years of actual incarceration—and despite the fact that *nothing* in Code § 19.2-303 (upon which the majority must rely) requires circuit courts to take into account a defendant's period of active incarceration when setting the period of suspension.

- 30 -

prison." *Hamilton v. Commonwealth*, 79 Va. App. 699, 708 (2024) (emphasis in original). The

Court restated this point in *Barrow v. Commonwealth*, 81 Va. App. 535, 550 n.7 (2024), where

we explained that *Hamilton* "expressly found that the maximum length of the period of

suspension is not affected by the amount of active time that the individual spends

incarcerated."[24] Therefore, contrary to the majority opinion's position, this Court has already

stated—in binding published opinions—that courts do not subtract a defendant's period of active

incarceration from the statutory maximum period of suspension (of the suspended sentence) to

determine the available period of suspension conditioned on good behavior. In other words, for

a crime that carries a maximum sentence of 10 years, if a person is sentenced to 3 years of active

incarceration, *Hamilton* and *Barrow* dictate that it is error to assume that the total available

period of suspension is 7 years.

This point is not only made clear in a binding published opinion from this Court, but it

also is the only possible conclusion in this case that makes logical sense. As the majority

explains, Code § 19.2-303 states that a "court may fix the period of probation for up to the

statutory maximum period for which the defendant might originally have been sentenced to be

imprisoned." Maj. Op. 17 (quoting Code § 19.2-303). By stating that the period of *probation*

can be set up to the statutory maximum period of imprisonment, and because probation only

begins upon release from incarceration, the General Assembly made clear that circuit courts can

set a period of post-incarceration monitoring (i.e., probation and good behavior) that is itself

---

[24] The majority states that *Barrow* "is consistent with our [the majority's] holding." Maj. Op. n.17. It is not. Nothing in *Barrow* supports the majority's claim that "the additional five-year condition of good behavior measured from White's release, . . . when combined with his active incarceration, authorizes an aggregate period of enforceable restraint [that] potentially exceed[s] the seven-year statutory maximum." Maj. Op. n.17. Nor could the holding in *Barrow* support such a claim as the applicable statutory language rejects the majority's argument. *See* Code § 19.2-303 (explicitly allowing courts at initial sentencing to "fix the period of probation for up to the statutory maximum period for which the defendant might originally have been sentenced to be imprisoned" with no caveat that the court subtract time already served).

equal to the maximum period of incarceration regardless of the period of active incarceration imposed by a circuit court in its orders. *See Probation*, *Black's Law Dictionary* (12th ed. 2024) (defining "probation" as "[t]he release of a convicted offender under conditions imposed by the court for a specified period during which the court retains the authority to modify the sentence or to resentence the offender if the conditions are violated"). The text of Code § 19.2-303 does not require a circuit court to go through some additional step where it must subtract a defendant's period of active incarceration to determine what is just left over for a circuit court to impose as a period of probation (or good behavior).

Furthermore, and equally important, the statutes governing a court's ability to suspend a defendant's sentence during the defendant's initial sentencing show that a court can fix the period of suspension for a suspended sentence for up to the statutory maximum period for which the defendant might originally have been incarcerated—without counting the defendant's actual period of incarceration. Code § 19.2-303.1, titled "Fixing period of suspension of sentence," states, "In any case where a court suspends the imposition or execution of a sentence, it may fix the period of suspension for up to the statutory maximum period for which the defendant might originally have been sentenced to be imprisoned." Code § 19.2-303.1. Code § 19.2-303, titled "Suspension or modification of sentence," similarly states that a "court may fix the period of probation for up to the statutory maximum period for which the defendant might originally have been sentenced to be imprisoned." Code § 19.2-303.

By their terms, Code §§ 19.2-303.1 and 19.2-303 do not require courts to calculate the maximum available period of suspension of a suspended sentence by subtracting the period of active incarceration in the sentencing order from the period of suspension established by the court. Instead, these statutes clearly state that the maximum available period of suspension of the suspended sentence is equivalent to "the statutory maximum period for which the defendant

might originally have been sentenced to be imprisoned." Code §§ 19.2-303.1, 19.2-303. By requiring courts to effectively subtract a defendant's period of active incarceration in the sentencing order from the "maximum period for which the defendant might originally have been sentenced" in order to arrive at the maximum available period of suspension of a suspended sentence, the majority is adding language to Code §§ 19.2-303.1 and 19.2-303 that simply does not appear in those statutes. The Supreme Court has repeatedly and just again this year stated, "Our duty is to interpret the law, not legislate, and thus we will not add terms to a statute that are simply not there." *Commonwealth v. Moncrea*, ___ Va. ___, ___ (Apr. 2, 2026). "'Our duty in applying this provision is "to construe the law as it is written," and we are also mindful that "[t]o depart from the meaning expressed by the words is to alter the statute, to legislate and not to interpret."'" *Id.* at ___ (quoting *Town of Leesburg v. Giordano*, 276 Va. 318, 323 (2008)).

Moreover, Code § 19.2-306—which according to its title governs "*Revocation* of suspension of sentence and probation" (emphasis added)—reveals that the General Assembly knows how to restrict a court's ability to set a period of suspension of a defendant's suspended sentence when it wants to do so. That statute states:

> If the court, after hearing, finds good cause to believe that the defendant has violated the terms of suspension, then the court may revoke the suspension and impose a sentence in accordance with the provisions of § 19.2-306.1. The court may again suspend all or any part of this sentence for a period up to the statutory maximum period for which the defendant might originally have been sentenced to be imprisoned, less any time already served, and may place the defendant upon terms and conditions or probation. *The court shall measure the period of any suspension of sentence from the date of the entry of the original sentencing order.*

Code § 19.2-306(C) (emphasis added). By requiring that the period of suspension be calculated from "the date of the entry of the original sentencing order" in *revocation proceedings*, the General Assembly expressly limited the maximum period of suspension available to circuit

- 33 -

courts by not allowing courts to *add* to the period of suspension in the original sentencing order when it revokes a suspended sentence but resuspends part or all of that suspended sentence.

However, by not including this same limitation in Code §§ 19.2-303.1 or 19.2-303—which govern initial sentencing[25]—the General Assembly expressly signaled that circuit courts do not face such limitations when conducting *initial sentencing hearings*. "When interpreting and applying a statute, we 'assume that the General Assembly chose, with care, the words it used in enacting the statute, and we are bound by those words.'" *Kiser v. A.W. Chesterton Co.*, 285 Va. 12, 19 n.2 (2013) (quoting *Halifax Corp. v. First Union Nat'l Bank*, 262 Va. 91, 100 (2001)). The Supreme Court has clearly stated, "[W]hen the General Assembly has used specific language in one instance but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional." *City of Hampton v. Williamson*, 302 Va. 325, 335 (2023) (alteration in original) (quoting *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011)). Courts "ascertain the will of the legislature" by "construing all statutes *in pari materia* in such manner as to reconcile, if possible, any discordant feature which may exist." *Lucy v. County of Albemarle*, 258 Va. 118, 129-30 (1999) (quoting *Tyson v. Scott*, 116 Va. 243, 253 (1914)). In addition, the Supreme Court has reiterated that "[i]t is a well-settled principle of law that where two statutes are in apparent conflict they should be so construed, if reasonably possible, so as to allow both to stand and to give force and effect to each." *Waller v. Commonwealth*, 278 Va. 731, 737 (2009) (quoting *Mahoney v. Commonwealth*, 162 Va. 846, 853 (1934)). Therefore, the circuit court did not err when it conditioned White's suspended sentence on five years of good

---

[25] *See Cisneros v. Commonwealth*, 82 Va. App. 147, 165 (2024); *Barrow*, 81 Va. App. at 545 n.4 ("This statutory scheme provides that Code § 19.2-303 governs trial courts' sentencing authority at the initial sentencing, Code § 19.2-303.1 governs trial courts' authority to impose periods of probation and resuspension at both the initial sentencing and subsequent revocation proceedings, and Code § 19.2-306 governs trial courts' authority at revocation proceedings.").

behavior upon his release from incarceration because the maximum available period of suspension for that suspended sentence in this case was seven years—not five years.

The only alternative available to the majority is to claim that the circuit court erred in this case because it was supposed to calculate the maximum available period of suspension from the date White first began serving his actual incarceration for his convictions and not from the date of White's release from incarceration. If this were true, then the good behavior requirement at issue in this case would extend beyond the maximum available period of suspension because the maximum available period of suspension of the suspended sentence in this case is 7 years, and the effective good behavior period would be 8 years and 3 months (5 years of good behavior plus 3 years and 3 months of actual incarceration).

Let us consider just one example of why that result would be illogical and would produce an absurd outcome. *See Commonwealth v. Delaune*, 302 Va. 644, 655 (2023) ("[T]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow or strained construction." (alteration in original) (quoting *City of Charlottesville v. Payne*, 299 Va. 515, 527 (2021))). For example, if a defendant was convicted of a crime with a maximum statutory sentence of thirty years, and he was sentenced to thirty years (including twenty years of active incarceration and ten years suspended) and a period of suspension of that suspended sentence for fifteen years, that period of suspension of fifteen years would run out before the individual could even leave prison. Thus, he would not be able to undergo probation upon release from incarceration or later have any of his suspended sentence revoked, even if he committed a felony in his first week of freedom out of prison because the period of suspension for the suspended sentences would be measured from the day he first starts serving his actual incarceration. Thus, under this reasoning, the period of suspension of the suspended sentence in

- 35 -

this situation would have run out and ended five years before the convicted individual even finished serving his active 20-year prison sentence.

However, the purpose of a period of suspension is to allow a person who has received grace[26] from the court in the form of a suspended sentence to be monitored through probation and be required to not do certain things (and to do certain things, including be of good behavior) during the period of suspension of his suspended sentence after his release from incarceration to see if that person's behavior remains appropriate. Thus, it is logical to measure such a period of suspension of the suspended sentence (and a requirement of good behavior) only from the release of the individual from incarceration. Indeed, it would be an absurd result to measure a defendant's period of suspension from the moment of his actual incarceration so that the period of suspension of the suspended sentences expires while he is still in prison serving his original active sentence. *See Taylor v. Commonwealth*, 298 Va. 336, 342 (2020) (stating that "a statute should never be construed in a way that leads to absurd results" (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 237 (2013))).

------

[26] The majority states, "A condition of good behavior is itself a restraint on liberty under Virginia law: it is enforceable through revocation and exposes the defendant to reincarceration." Maj. Op. n. 20. Under this very broad logic, most laws are then essentially "a restraint on liberty" because a defendant's violation of those laws could "expose[] the defendant to []incarceration." Maj. Op. n.20. In other words, the majority's definition of a "restraint on liberty" is too expansive, and it misses the point. The point is that a good behavior requirement is not actually a punishment, that Virginia law specifies that the suspension of a sentence is an act of grace, and that suspending a defendant's sentence based on a condition of good behavior is actually probably the most liberty-enhancing act a court can take when a defendant has decided to violate the law. *Thomas v. Commonwealth*, 296 Va. 301, 307 (2018) ("The purpose of post-release supervision is not punishment. Rather, this period is designed to foster good behavior and rehabilitation upon release from confinement."); *Johnson-Bey v. Commonwealth*, 303 Va. 386, 397 (2024) (where the Supreme Court has clearly stated, "[T]he suspension of a criminal sentence is an 'act of grace'" that is "exercised for the 'remedial purpose' of encouraging the rehabilitation of criminals"); *United States v. Lara*, 850 F.3d 686, 690-91 (4th Cir. 2017) ("The governmental interest in enforcing liberty-restricting conditions is especially strong when supervision is employed as an alternative to incarceration, including when, as here, a court partially suspends a sentence of imprisonment.").

Thus, the maximum available period of suspension of a suspended sentence conditioned on good behavior, at least during the initial sentencing, must be calculated from the date of a defendant's release from incarceration and not from the date a person begins his actual incarceration. Holding otherwise, as shown *supra*, would greatly limit (and sometimes even effectively remove) the ability of sentencing courts to condition a defendant's suspended sentence on good behavior in many cases—and thus violate the very purpose of suspended sentences altogether. *See United States v. Kebodeaux*, 570 U.S. 387, 397 (2013) (citing a legal treatise as saying that the "principal purposes of postrelease conditions are to rehabilitate the convict, thus preventing him from recidivating, and to protect the public"); *Minh Duy Du v. Commonwealth*, 292 Va. 555, 569 (2016) (explaining that "suspension and probation provide remedial tools to use in the rehabilitation of criminals and the protection of the community"). Therefore, for all these reasons, the trial court did not commit error to begin with when it required White to be of good behavior for five years after his release from active incarceration.

II. The Supreme Court's Admonition in *Moncrea*

Even under the majority's interpretation of White's sentencing order and the applicable statutes, it is not at all clear that the sentencing order is erroneous. For White's 5-year period of good behavior to be erroneous under the majority's interpretation, White must be imprisoned for at least 2 years and 1 day after the date of White's sentencing order (because the 5 years of good behavior required upon his release—plus 2 years and 1 day of incarceration—would, when added together, exceed the 7-year statutory maximum period of incarceration for White's offenses by 1 day). The majority makes this assumption (1) even though White was given credit for a considerable amount of time that he served while awaiting trial, (2) even though White received credit for more time that he served between his trial and before the final sentencing order was issued on February 27, 2024, and (3) even though we do not know what portion of the

rest of White's sentence of incarceration will actually be served because, at some point, he is likely to be released on parole before serving the entire 3 years and 3 months of his active sentence. *See* Code § 53.1-202.3.

In *Commonwealth v. Moncrea*, ___ Va. at ___, the Supreme Court ruled that Moncrea's final sentencing order was not erroneous even though that order imposed an indefinite period of supervised probation.[27] The Supreme Court explained that "Moncrea has not argued that he has already been forced to serve more than five years of supervised probation" and noted that Moncrea only argued "that he *could* be" subject to more than five years of supervised probation. *Id.* at ___ (emphasis in original). In reversing this Court, the Supreme Court said that it declined "to speculate as to the trial court's future exercise of its discretion as well as assume that in the future exercise of its discretion, the trial court will violate" statutes. *Id.* at ___. This Court is faced with a similar situation in this case because it must assume—under the majority's interpretation of the applicable statutes—that White will serve at least 2 years and 1 day of his period of incarceration after the date of his final sentencing order and also that the circuit court will decide not to exercise any ongoing discretion over White that it has. *See id.* at ___ (where the Supreme Court explained that trial courts possess certain ongoing authority to modify probation periods and conditions).

The information provided to this Court on brief and in the record on appeal indicates that White was held in confinement without bail from the date of his arrest on March 10, 2023 until the date that the final sentencing order was released on February 27, 2024. R. 41, 21-23, 108. The record further indicates that White received credit from the circuit court for all of that time he had already served toward his active sentence of 3 years and 3 months. R. 108. In addition,

_____

[27] Code § 19.2-303 limits supervised probation to a maximum of 5 years from the release of the defendant from active incarceration.

- 38 -

under Code § 53.1-202.3, White was eligible for a reduction of 4.5 days for each 30 days served on his felony assault and battery conviction if he complied with certain rules and requirements and participated in certain programs. Code § 53.1-202.3. He may also have been eligible for additional reductions on his obstruction of justice convictions. It is therefore certainly unclear and rather unlikely that White would actually serve 2 years and 1 day past the original sentencing date that the majority claims is the date from which we must measure. Therefore, it is also at least unclear and probably unlikely that the sentencing order in this case actually exceeds the 7 years that the majority claims. Regardless, this kind of speculation is exactly what the Supreme Court just recently forbade in *Moncrea*.

Therefore, under *Moncrea*, it is unlikely that even the majority's interpretation of the applicable statutes would make the final sentencing order erroneous.

III. Even if Error, Simply Requiring 5 Years of Good Behavior Is Not a Miscarriage of Justice

Furthermore, while I believe the trial court did not err here, even if the circuit court did err when it conditioned White's suspended sentence on five years of good behavior, White did not raise this objection to the trial court. Therefore, White's challenge to the good behavior requirement was not preserved for appeal.

"The distinction between void and voidable judgments is crucial to this appeal because objections to a voidable error are waivable by a party's failure to raise them below." *Cisneros v. Commonwealth*, 82 Va. App. 147, 164 (2024). In its recent opinion in *Hannah v. Commonwealth*, 303 Va. 106, 124 (2024), the Supreme Court explained that "any error arising from a misapplication of Code § 19.2-303.1 would render a judgment voidable at most." The Supreme Court described voidable errors as "usually involv[ing] a court's failure to comply with precedent or an applicable statute." *Id.* at 120. The Supreme Court then explained that errors in the application of Code § 19.2-303.1 make a court's order voidable because it found "that Code

- 39 -

§ 19.2-303.1 did not abrogate the court's subject matter jurisdiction to decide Hannah's revocation." *Id.* at 123. Rather, the Supreme Court stated that "[c]ircuit courts already possess jurisdiction to adjudicate criminal matters and their power to sentence and preside over revocations is ancillary to that jurisdiction." *Id.* at 124.

Code § 19.2-303 is closely related to Code § 19.2-303.1 and "governs trial courts' authority to suspend a sentence and place a defendant on probation at the original sentencing." *Cisneros*, 82 Va. App. at 165. As with errors in the application of Code § 19.2-303.1, errors in the application of Code § 19.2-303 also only make a court's judgment "voidable at most" because the power of circuit courts "to adjudicate criminal matters and their power to sentence" exists separate and apart from Code § 19.2-303. *Story v. Commonwealth*, No. 1794-23-4, slip op. at 8-9, 2025 Va. App. LEXIS 201, at *12-13 (Apr. 8, 2025) (quoting *Hannah*, 303 Va. at 124).[28] Indeed, this Court already stated as much in *Story v. Commonwealth*, when we held, "Given that an order imposing an overly long period of suspension to enable review for probation revocations (i.e., a misapplication of Code § 19.2-303.1) is not void *ab initio*, it follows that an order imposing an overly long period of supervised probation (i.e., a misapplication of Code § 19.2-303) is also not void *ab initio*."[29] *Id.*, slip op at 9, 2025 Va. App. LEXIS 201, at *13. Thus, because court orders misapplying Code § 19.2-303 are voidable and not void *ab initio*, and since "objections to voidable errors must be preserved," *Hannah*, 303 Va.

---

[28] Story appealed to the Supreme Court. The Supreme Court refused his appeal.

[29] *See also Cook v. Commonwealth*, No. 1071-24-2, slip op. at 4, 2025 Va. App. LEXIS 533, at *5 n.3 (Sept. 16, 2025) (citing *Story v. Commonwealth* and stating that there, "we determined that a circuit court's misapplication of Code § 19.2-303 rendered the court's order voidable—not void"). In *Story*, the appellant argued on brief before this Court that the explicit 5-year period of good behavior that appeared on the face of one of the challenged orders in that case was unlawful. We affirmed the circuit court, holding that the error Story alleged was not preserved for appeal and that the trial court's order requiring 5 years of good behavior was voidable—not void ab initio. *Story*, slip op. at 2, 2025 Va. App. LEXIS 201, at *2.

at 120, White had to comply with Rule 5A:18 to preserve his argument for appeal. His failure to so comply means that this Court can only reach White's claim by invoking the ends of justice exception. However, since requiring someone with a suspended sentence to be of good behavior for five years after release from incarceration is hardly a manifest injustice, this Court should not invoke the ends of justice exception in this case.

"The 'ends of justice' exception to Rule 5A:18 is 'narrow and is to be used sparingly.'" *Melick v. Commonwealth*, 69 Va. App. 122, 146 (2018) (quoting *Pearce v. Commonwealth*, 53 Va. App. 113, 123 (2008)); *see also Jimenez v. Commonwealth*, 241 Va. 244, 249 (1991) ("Indeed, it is a rare case in which, rather than invoke Rule 5:25 [the Supreme Court's equivalent of Rule 5A:18], we rely upon the exception and consider an assignment of error not preserved at trial 'to enable this Court to attain the ends of justice.'"). "Invoking the ends of justice exception to the contemporaneous objection rule requires a determination not only that there was error in the judgment of the trial court but also that application of the exception is necessary to avoid a grave injustice." *Charles v. Commonwealth*, 270 Va. 14, 20 (2005). "Th[is] burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Cisneros*, 82 Va. App. at 170-71 (alteration in original) (quoting *Holt v. Commonwealth*, 66 Va. App. 199, 210 (2016) (*en banc*)). "It is not enough to simply 'show that the Commonwealth *failed* to prove an element or elements of the offense[;] . . . to avail oneself of the exception, [the appellant] must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred.'" *Id.* at 171 (alterations in original) (emphases in original) (quoting *Holt*, 66 Va. App. at 210). "Error alone, even a violation of constitutional principles, is not sufficient to warrant application of the ends of justice exception to Rule 5A:18." *West v. Commonwealth*, 43 Va. App. 327, 339 (2004).

Therefore, binding caselaw from this Court makes clear that invocation of the ends of justice exception is not appropriate even when there is a violation of constitutional principles when that violation was not ever argued to the trial court. *See Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (stating that "Rule 5A:18 applies to bar even constitutional claims" and holding that "the record in this case does not reveal any reason to invoke the 'good cause' or 'ends of justice' exceptions" to consider the appellant's argument under the United States Constitution), *aff'd*, 270 Va. 1 (2005); *Clark v. Commonwealth*, 78 Va. App. 726, 767-69 (2023) (refusing to apply the ends of justice exception to consider appellant's claim that the composition of the jury below violated the Virginia Constitution). Indeed, that caselaw clarifies that even an argument that someone's basic constitutional rights have been violated must be preserved for appeal,[30] or the ends of justice exception will not apply to preserve even those very serious claims. Yet the majority has decided to invoke the ends of justice exception in this case because White may have been subjected to simply a requirement of good behavior that they claim is possibly longer than it should be. However, the bottom line is that simply requiring someone to be of good behavior is hardly a miscarriage of justice.

The majority cites *Charles v. Commonwealth* for the proposition that the application of the ends of justice exception is justified in this case because "[d]enying [a defendant] his liberty [based on] a void sentence would impose a grave injustice." Maj. Op. 26 (quoting *Charles*, 270 Va. at 20). However, this case is unlike *Charles* because the circuit court in *Charles*, at a revocation proceeding, imposed more active incarcerated time on Charles to serve than he was actually sentenced to during his initial sentencing. *Charles*, 270 Va. at 20. The majority also

---

[30] *See Swann v. Commonwealth*, 247 Va. 222, 229 (1994) (where the Supreme Court, even in a capital murder case, refused to consider some of Swann's assignments of error because Swann's prior objections to the court's rulings below "were not based on the constitutional grounds that he asserts for the first time" on appeal).

cites to *Fletcher v. Commonwealth*, 72 Va. App. 493, 510 (2020), but the case now before us is also unlike *Fletcher* because there the circuit court "sentenced appellant to a term of incarceration of twenty years" for a crime that "carrie[d] a mandatory maximum sentence of ten years of incarceration."[31]

Finally, the majority relies on *Rawls v. Commonwealth*, 278 Va. 213 (2009), to invoke the ends of justice exception in this case. Maj. Op. 25-26. However, *Rawls* does not actually concern the ends of justice exception at all. Indeed, in *Rawls*, the Supreme Court held that Rawls's sentence of incarceration was void *ab initio* because the circuit court sentenced Rawls above the statutory maximum period of incarceration for Rawls's offense of second-degree murder. 278 Va. at 221. The Supreme Court then vacated Rawls's sentence and remanded the case back to the circuit court for a new sentencing hearing on his second-degree murder conviction without even mentioning the ends of justice exception. *Id.* at 221-22. The five years of good behavior required in this case are simply not the same restraint on liberty as the five years of incarceration above the statutory maximum at issue in *Rawls*.

The majority also states that when a sentencing order "produces enforceable post-release restraint exceeding the statutory ceiling on post-release supervisory authority" then it "is void ab initio" under *Rawls*. Maj. Op. 21-22. It is not clear how the majority has extracted such a rule from *Rawls*. As noted *supra*, that case concerned a criminal defendant who was sentenced to 25 years of incarceration, which was above the statutory maximum of 20 years of incarceration for his offense of second-degree murder. *Rawls*, 278 Va. at 221. Applying *Rawls*'s "void ab initio rule" to cases like this one, where the defendant has not been sentenced above the statutory maximum period of incarceration for his offense (receiving 6 years and 3 months instead of the

---

[31] Indeed, the Commonwealth actually joined Fletcher in urging this Court in *Fletcher* to apply the ends of justice exception to Rule 5A:18. *Fletcher*, 72 Va. App. at 510.

statutory maximum of 7 years), would be a significant expansion of *Rawls*. In fact, in 2019 in *Commonwealth v. Watson*, 297 Va. 355 (2019), the Supreme Court "clarif[ied] that our holding[] in *Rawls*" and its progeny apply when "(1) the General Assembly has prescribed a statutory range *of sentences for an offense*,[32] and (2) a sentence is challenged at a procedurally permissible time as lying outside that range." *Id.* at 360 (emphasis added).[33] *Rawls* thus does not apply to this case because this case does not concern an actual sentence of time to be served (or a suspended sentence that could be served) that is over the statutory maximum and rather only concerns a perhaps overly long period of good behavior *after* release from incarceration. *Id.* (The Supreme Court added, "While the language we used when we decided [*Rawls* and its progeny] was intended to be broad, our decisions were nevertheless restricted to the legal question in dispute").

The majority has therefore not shown any caselaw in which this Court or the Supreme Court has invoked the ends of justice exception to address something as minor as a good behavior requirement—a requirement that in itself does not increase actual active incarceration affecting White's liberty. The Court's decision today nonetheless to move forward with invoking the exception here runs the risk of transforming a rarely used, exceedingly narrow exception to Rule 5A:18 into a new "Rule"—where the exception, even for simply requiring

---

[32] A "sentence for an offense" definitionally does not include good behavior requirements. *See Sentence*, *Black's Law Dictionary* (12th ed. 2024) (defining a "sentence" as "the *punishment* imposed on a criminal wrongdoer" (emphasis added)); *Thomas*, 296 Va. at 307 ("The purpose of post-release supervision is not punishment. Rather, this period is designed to foster good behavior and rehabilitation upon release from confinement."). *Rawls* therefore also does not apply in this case because it only applies when the *punishment* imposed on a defendant exceeds the statutory maximum—not a mere good behavior requirement that is simply not a punishment.

[33] The "progeny" that the Supreme Court analyzed in *Watson* was *Grafmuller v. Commonwealth*, 290 Va. 525 (2015). In that case, the charged "offenses had five-year statutory maximums but the court sentenced him to 10 years' imprisonment on each." *Watson*, 297 Va. at 359.

good behavior for five years upon release from incarceration, simply swallows the rule—and would cause Rule 5A:18 to be rarely enforced in appeals of criminal convictions and sentencing.

CONCLUSION

Therefore, for all of these reasons, I respectfully dissent from the Court's decision today reversing the sentencing of White. I would instead affirm the circuit court's judgment both on White's convictions and his sentencing because the circuit court actually did not commit error when it imposed a five-year period of good behavior on White to begin upon his release from incarceration. And, even if doing that were error, simply requiring someone with a suspended sentence to be of good behavior for five years upon release from incarceration is hardly a miscarriage of justice.